Page number 22-5137, Federal Trade Commission Affiliate v. Endo Pharmaceuticals Inc. et al. Mr. Hegadis for the Affiliate, Mr. Gordon for the Appalachian Endo Pharmaceuticals et al. Mr. Lefkowitz for the Appalachian Impact Laboratories LLC et al. Good morning, counsel. Mr. Hegadis, please proceed when you're ready. Good morning, Your Honors. May it please the Court, Mark Hegadis for the Federal Trade Commission. When a company with a pre-existing right to compete agrees with a competitor to eliminate competition between them, that agreement could be subject to antitrust scrutiny. The FCC complaint charges that Endo and Impact entered into that kind of an agreement. In 2017, the company decided that rather than vote vowing upon an ER, they would agree that Endo would exit the market, stay off the market, and they would share the resulting monopoly profits. That agreement harmed competition and it harmed consumers. And the FTC should have the opportunity to show that that agreement violated the antitrust laws. The District Court should not have dismissed the FTC's complaint for two basic reasons. First, the Court was wrong to conclude that the agreement was simply an exercise of Endo's patent rights. The complaint plausibly alleged that Impact already had a broad, risk-free, non-exclusive license. Under the guidance of an exclusive license, however, Impact purchased an unlawful monopoly. Second, the District Court wrongly concluded that the FTC did not state an antitrust claim because the Patent Act permits patentees to grant exclusive licenses. But the Supreme Court has made clear that patent settlement agreements are subject to rule of reason and review, just like other restraints of trade, and the FTC should be permitted to show that the 2017 agreement is unreasonable under the rule of reason. Can I ask you just an up-front question, and that is, your complaint charged Impact alone with violating Section 2 of the Sherman Act, but your arguments to us have not distinguished between Impact and Endo. So for purposes of your appeal here, there's no difference between the two of them? The complaint charges that Impact and Endo violated Section 1. Correct, but only Impact violated Section 2. In terms of the unlawful monopolization, Section 2, it runs just to Impact, because Impact is the one who enjoys the monopoly as a result of the agreement, and the agreement itself is the exclusionary conduct that we allege that violates Section 2. But you're correct, Your Honor, Count 1, the Section 1 count is against both Endo and Impact, but the Section 2 count is against Impact alone. And your brief here hadn't broken out the second distinct liability, alleged liability, to be clear, for Impact, but I take it your theory is because that just grows out naturally from, if the Section 1 claim goes forward, then the fact that Impact would be the one receiving the monopoly, i.e. having the Section 2 claim would come from that, so that's why you didn't break them out separately here? That is correct, Your Honor. The exclusionary conduct on which we rely is the agreement itself. If we're unable to prove that that agreement is a violation of any trust laws, is anti-competitive, then we can't proceed with our Section 2 claim, because that agreement is the exclusionary conduct that is one of the requirements for a Section 2 claim. You want to make sure about that, okay. Yes. I'm sure I understood that right. So, with respect to Impact's ability to be on the market, the 2010 license gave Impact this broad, non-exclusive, right-to-compete license, and it was royalty-free, and Impact was on the market. That allegation complaint stems right from the license itself. It also reflects the party's characterization of that license made in two separate federal proceedings. In those one proceeding in the Northern District of Illinois, Endo told that court that the agreement was a right-to-compete agreement, which allowed Impact to be on the market risk-free. Before the Federal Trade Commission, Impact represented that this agreement was a broad license, and it allowed Impact to be on the market. Both of those representations were, in fact, made after Endo filed its suit against Impact in 2016. That was Endo's position in the litigation, including the 2016 litigation, but it was disputed, at least at that point in time, by Endo. And so, Endo, you know, survived a motion to dismiss, and Impact is facing treble damages, which would be crippling to anybody. That's the point of treble damages. And so, there was, you know, its right to stay on the market. What can we, as a matter of law, say would allow an inference of anti-competitive conduct for the two of them to resolve that disagreement and to do so in a way that actually gives Impact something it didn't have before, and that is an exclusive license and a non-compete agreement from Endo? Your Honor, there are several parts to my to resolve that dispute as part of the ruling on the motion to dismiss, and the district court respectively fought Endo and Impact's version of the dispute between us, and it was our complaint, and the complaint could have been given. The allegations of the complaint should have been disproved in our favor. But secondly, when you... Can I just make sure? I do want to hear you listen. I'm so sorry to interrupt, but I'm not sure I even understand point one. It was improper for them to settle after the motion to dismiss? They couldn't settle after the motion to dismiss? No, Your Honor. I'm sorry if I... I'm sorry, I misheard you, I'm sure. And I'm sorry if I suggest that it was improper for them to settle after the motion to dismiss, but rather the fact of that dispute does not provide a basis to not accept as plausible the allegations in our complaint. And so the motion to dismiss in our case should have been decided based upon the allegations in the complaint, not based upon the fact that there was this legal dispute between Endo and Impact. Now, with respect to that case, we also plausibly alleged that the Endo suit did not seek to take Impact out of the market. The suit was about the appropriate royalty. You can examine the complaint itself, and it's all about the royalty. There's no indication that Endo was trying to take Impact off the market. In addition, Impact, excuse me, Endo did not seek to enjoin Impact from making those sales when it filed that suit. And even if Endo had succeeded in that suit, the chances of it succeeding in taking Impact off the market were low or would have been a difficult case for Endo to make because it would have to have shown that it was irreparably harmed if it had to meet the standards or the traditional standards for an injunction. And that comes from the Supreme Court's decision in eBay. So the hurdles to Endo being able to take Impact off the market were substantial, which supports why it was that the court should not have credited the existence of that dispute as grounds to not accept as true our allegations that the complaint plausibly alleged that Impact had a right to be on the market. And that's an important allegation because it goes to the anti-competitive effects of this agreement. This was an agreement between competitors. They agreed that one of them would not compete, and they would share monopoly profits. Why couldn't you always say that whenever there's a patentee that enters into an agreement with a licensee to license the patent? They're potentially competitive, and the patentee can grant a license to the licensee in exchange for royalty. That's just garden variety stuff that happens all the time, as I understand it, in the patent sphere. Your Honor, it does happen all the time in the patent sphere, although many of those agreements are between patentees and licensees who are not competitors. They stand in a vertical relationship where, for some reason, the patentee determines, well, let's suppose it's not. Let's suppose it's not what you're characterizing as the vertical arrangement. Let's just suppose it's just a situation in which there's a manufacturer of a product, and then there's somebody who could make a generic. And so there, I think those are organo. And then there's just an agreement. The manufacturer of the generic just says, look, we'll license you the patent, and in exchange for that, pay us a royalty. And it's an exclusive license. Let's just make it even more exclusive than this is. It's as inclusive as it can be. We're not going to get into this space. We're giving it to you, but you're going to pay us a royalty. That just seems like that's standard fare. So, Your Honor, that is not standard fare. No. Okay. That, in a way, describes a possible alternative agreement that could have been entered into the activist case itself. And I see, Your Honor, that I'm beyond my initial time limit. I reserve five minutes for rebuttal, so I just want to acknowledge that. We'll give you some rebuttal time, but you should keep answering questions as long as we ask them. Okay. Yes, Your Honor. Thank you. I just wanted to acknowledge my time limit, of course. So, suppose an activist, rather than the generic agreement to stay out of the market for a share of the brand's monopoly profits, the agreement had been that the generic would enter the market, the brand would exit, the generic would pay a portion of it to split the royalties, split its revenues with the brand as a royalty. That agreement is anti-competitive in the same way that the agreement in the activist case is anti-competitive. You have two competitors coming together, agreeing that only one of them will compete, and then they will share the resulting monopoly profits. Let me go ahead. You probably have the same question. I thought the patent statute just allows the patent holder to grant a license. Isn't that the patent? Isn't that a basic part and parcel of having the patent, is that you can license it and exclusively license it? I take it that this is how an exclusive license works, is that you grant an exclusive license in exchange for granting the exclusive license to get something, and one thing that seems readily conceivable that you would get is a payment of a royalty. It does allow that, but activist holds, as did a long series of cases that preceded activists, that that kind of agreement, if it has anti-competitive effects, should at least be examined under the antitrust clause, and that's all we're asking. I thought the activists thought that, at least in part because of what it viewed to be the peculiarities of a reverse payment arrangement, but what I'm hypothesizing I think doesn't fit within that description. It's just the standard situation in which a patent holder grants a license and making an exclusive license to make it as anti-competitive as possible in the way that I think you're perceiving the world, and in exchange for granting the exclusive license, the licensee pays a royalty. Economically, your honor, the situation you're hypothetical and the situation activists are the same in that competitors, where there's some doubt about one of them to be on the market, agrees that one of them will stay off the market, and they will share the resulting monopoly profits. So whether that is achieved by the brand staying on the market and then paying the generic to stay off the market, or the generic coming onto the market and the brand coming off the market for share of the royalties, the economic effect is the same. Under your position, going forward, no patentee could undertake, say in 2010, they had just done, they had taken what they did in 2010, 2017, just did it all in 2010. They just issued, they agreed to an exclusive license, non-compete agreement, exclusive license, and compensation for royalties in 2010. They just did it all at once. They and no other patent holder in this country who does an exclusive licensing agreement with a competitor, potential competitor, it's in the pharmaceutical area, right? With a, you know, a brand and a generic. Those can never be assumed going forward to be within the patent's power. Because just to throw the table, an activist, part of what the court was concerned about was, you know, the weirdness of the patent holder sort of paying off and giving and paying the competitor. And that there was concern that that suggested the fragility or concerns about the patent and whether it would fail the invalidity challenge, which you don't have here. This patent has survived invalidity challenges right and left. So you've got a good, strong patent here. Just assume in 2010, they had made an exclusive licensing agreement in 2010. One fell swoop. Non-compete agreement, exclusive license, but strong patent. You know it's a strong patent. And royalty payments. They couldn't assume going forward that that would be okay. Every one of those agreements is going to have to be subject to rule of reason analysis. Your Honor, it is potentially subject to the rule of reason analysis, but there are several responses to the hypothetical you posed. I'm assuming that in that initial 2010 agreement that the two parties, in fact, were competitors or potential competitors. Only potential in the sense that it's happened here, but it was on activist pharmaceuticals too. And that is using Hatch-Waxman, the generic says, I want to come on the market. I'm the first filer. I want to come on the market, get my 180-day period of generic exclusivity. And to do that, I have to file this form, which essentially says, I think your patent's in doubt. So it's the sort of statutory thing. So that, yes, they're certainly definitely competitors. Right. Potential competitors. Yes, Your Honor. And that relationship really does make a difference in the antitrust analysis. But more fundamentally, the rule under activists, which itself is based upon a long series of cases, is that the mere possession of a patent or the mere exercise of the patent rights does not immunize an agreement from antitrust scrutiny. Now, it may be that many agreements are not a problem under the antitrust laws because perhaps the patent itself does not give the market power in an economic sense. So the patent does not give the patentee monopoly power in the economic sense. It only gives it monopoly over the patented product. Another issue is the competitive effects analysis itself, which is very important. So there are many agreements that would escape antitrust scrutiny. And that's really the ordinary licensing situation that's been posited here by a number of your honors. Just to be clear, had they done the same, had they done in 2010, would they accomplish, if you combine 2010 and 2017, if they had just done the exclusive, instead of doing a licensing agreement, but it wasn't exclusive until 2017. If in 2010, instead, they had just done the exclusive licensing agreement up front, it'd be no better off. We'd be in the same, we'd be here in the same challenge. If we could make a case that impacts in that situation, that in that situation was a legitimate competitor on the market. Potential competitor. Right, right. In that case, that agreement would be subject to antitrust scrutiny. It would not, it certainly would not enjoy immunity under the- How would it be any different? I'm sorry. How would it be any different? How would your claims be any different under my hypothetical where you just up front do an exclusive licensing agreement than what you have here? Would it be the same? Economically, it would be the same. I don't mean economically. Legally, would it be the same? They'd be in the same legal boat. Yes, Your Honor. Yes, Your Honor. Antitrust is guided by economic realities and in both the hypothetical agreement where impact is the monopolist, is the only one on the market, or excuse me, impact at the outset, or this agreement where it happened after impact had been on the market and had a right to be on the market pursuant to the 2010 agreement, you have- So the fact, it's important what you just said. So the fact that they were already on the market by 2017, which you talked about a lot in your brief, actually doesn't matter for your antitrust theory. All that matters is that ENDO gave impact and at the end of the day, we add it all up, ENDO gave impacts and exclusive licensing agreements. You know, ENDO said, and non-compete, right? ENDO's out. That's all that matters. And then that can always be challenged. Maybe you'll win, maybe you'll lose, but it can always be challenged under the rule of reason analysis because it creates a monopoly. Yes, Your Honor, because they are in a horizontal relationship. Yes, I'm surprised because I thought that the theory, that your theory, and I'm not saying that necessarily this theory would necessarily work. I'm not saying it doesn't work either, but I thought your theory was bottomed in the existence of the 2010 agreement as the predicate. And the 2017 agreement only becomes problematic by virtue of the 2010 agreement. But it sounds like your view based on your answers to Judge Millett's questions and the questions that I was posing earlier is that actually 2010 turns out not to matter because all that matters is that at the end of the day, there was the grant by one patent holder to a potential competitor of an exclusive license. And once you have the grant of an exclusive license, and what that does is it reduces the field of competition because these two entities could be in competition. Now it turns out only one of them is going to be producing. That creates anti-competitive consequences because prices can potentially go up, which of course they can whenever there's a monopoly, and that's anti-competitive. So it sounds like it doesn't matter that this happened in two steps because if it all happened in one step, it would be the, and I think there's something to that, that it would be economically the same thing. And that was going to raise some questions about why should we draw a distinction if it goes between two steps, goes sequentially one step to two, or if it just collapses into one. But it sounds like you're now just saying actually it doesn't matter that it happens sequentially. What matters is that at the end of the day there's the grant of an exclusive license, and that's subject to rule of reason scrutiny period after access. Yes, Your Honor, there is an important difference just in terms of how it is that Impacts is a competitor in the two circumstances. In the original 2010, or their dispute that led to the 2010 license, Impacts was threatening Endo's patents. There was a patent challenge to the validity of those patents. And so that war, those were the relevant facts as to why Impacts was a competitor. In 2017, Impacts is on the market because it received this license in 2010. And it's important to bear in mind that what a license is. A license, then this line of patents, is subject to anti-trust scrutiny in 2010. Maybe I've missed this whole exchange, but I thought in response to the questions that we're posing to you, theoretically it doesn't matter that Impacts got anything in 2010. All that matters economically and legally under the anti-trust laws after activists is that a monopolist patent holder granted an exclusive license to a potential competitor. Once you have that, that's subject to anti-trust scrutiny after activists. If that's true, then what you were starting to say and what I thought your brief focused on and your complaint is predicated on actually doesn't matter. Because in the 2010 agreement, everything that happened in 2017 could happen all the time between a patent holder and the producer of a generic who wants a license to make the generic. And you're saying that that gives rise to anti-trust scrutiny under the rule of reason. That arrangement just gives rise to it because it's anti-competitive in that it's a monopolist patent holder who's granting an exclusive license to a potential competitor. That reduces the field of competition, ergo, rule of reasons scrutiny. Yes, Your Honor. How we get to that position, you know, you could have had the hypothetical that the parties entered into this agreement from the get-go. Yeah. That would be an anti-trust problem. The same anti-trust problem. Right. It would be the same one as if 2010 never happened. The facts of how they got there are relevant in terms of understanding the purpose of this agreement. So I'm not saying that the facts are irrelevant. We do need to consider them as part of the rule of reason analysis. But at the end of the day, the economic effect is you have two competitors deciding that one of them will not compete and they will share the monopoly profits. And they do that in settlement of a dispute. So when a patent holder, the patent holder has a monopoly, right? I mean, I think it's just taken as a given that a patent gives a monopoly. Over the patented product, Your Honor. Right. So at the time this agreement was entered into, the 2017 agreement, the patent, ENDO's patent could not exclude impact. The patent is a right to exclude. But by giving the agreement, the 2010 license, ENDO can no longer exclude impact. That proposition is recognized in this court's case, which is discussed a lot in the party's Studiengesellschaft case, or SK for short. When a patentee gives a license to a licensee, it can no longer keep that licensee off the market. And so that distinguishes this situation from a situation where a licensee had no ability to be on the market. And so that's what makes this doesn't seem to matter. Because I thought, if I understood your questions earlier, that doesn't matter because even had they never, if impact had never been on the market, they just up front in 2010 said, all right, you know, you've challenged my patent. You're doing the Hatch-Waxman thing. I get it. We're going to do a settlement agreement right now. In 2010, it says you can go on the market for the first time. And you go on exclusive. And you have that exclusive market, even as against me, the patent holder, until the end of the patent flight. We'd be in the same boat. You'd have the same issues. You'd have some different facts. Maybe intent's a little hard to prove. I don't know. But you have two competitors agreeing not to compete and to instead create a monopoly from which they both benefit. That is correct, Your Honor. And it's a concern because at that point, the monopoly is not coming from the patent. The economic monopoly is not coming from the patent. It is coming from the party's agreement. It is coming from the patent because somebody is going to exploit the patent. They'll get antitrust scrutiny if the patent holder decides not to license. The patent holder just decides to practice the patent. I don't even know if I'm using correct verbiage in the IP space. I don't know that space. But if the patent holder just decides to, I think, practice the patent and then produce the product, that's not subject to antitrust scrutiny. If that's true, then if the patent holder just says, okay, I'm not going to do it, you're going to do it. And I'm not going to get in that space. It's just you're going to substitute for me. Isn't that the exact same thing? No, Your Honor. There are two components to my answer to your question. The first is that the patent monopoly granted by the Patent Act doesn't mean that the patentee gets to exercise monopoly in the marketplace in the antitrust sense. It may be that there are products that compete with the patented product. And that's significant here because IMPACT had this license. IMPACT had a product that competed with ENDO's patented product. So IMPACT was no longer within the exclusionary potential of ENDO's patent. So it's just not a getting into separating the 2017 from the 2010. And I thought your answer was pretty clear to me that it wouldn't matter whether IMPACT was already on the market. What matters is that two competitors have put their heads together and created a monopoly, an exclusive, I'm being redundant but a really locked in monopoly with a non-compete agreement. And you've got, unlike activists, you've got every sign this is a good, solid patent that's been held up many times. There's no reason to think anyone else is going to be able to break it. It's a good, solid patent. It doesn't matter that ENDO was already in the market, I think under your theory. The fact is you've got the two competitors agreeing to create this monopoly, lock it in, and share the profits. And we'll send that price soaring up, and we're going to share those profits. So, Your Honor, I was attempting perhaps to not do a good job of addressing Judge Srinivasan's question about the impact of the patent. And doesn't that just give this right to monopoly? And the fact is it provides the ability for the patentee to have a monopoly over the patented product. But it may be that there are products that do not infringe that patent. So, going back to your hypothetical, Judge Millett, yes, very solid patent in terms of having been found valid in multiple cases. And in fact, there are multiple cases here. But it's not just patent validity that matters. If you read activists, they also talk about patent infringement. And a concern arises is if there is the removal of uncertainty regarding infringement, and you remove that uncertainty by entering into an agreement not to compete and to share the resulting monopoly profits, that's also an antitrust concern. So, that's what was going on But under this agreement, you could still have other drugs come in that can compete. As long as they don't infringe the patent. So, you've got the same, no, it got no ability to wall off, you know, APANO-like but not infringing products. So, it's exactly the same as my do-it-all-in-2010 hypothetical. There or in this two-step that's happened here, they've created a monopoly over APANO or the generic equivalent of it, the extended release generic. That's locked down, and that seems pretty solid. But the ability to agreement or a 2010 plus 2017 agreement. Your Honor, we would need more information about the relevant market and whether, in fact, there were other products that could compete against APANO-ER without infringing the APANO. Is your theory in this case that the 2017 agreement went beyond somehow and somehow prevents competition even of products that would not infringe a patent? Have I misunderstood you all this time? Yes, Your Honor. If we define the market as the market for APANO and generic versions of APANO, um, this agreement affects that marketplace. Now, there could be another... So, what part of generic is that it's equivalent? I'm sorry, Your Honor? What part of a generic is that it's equivalent? That's right. And it would infringe the patent, right, to do it. The first year APANO was out and there was marketing, and if someone came up with a generic bio-equivalent drug and marketed it, they would infringe the patent. Yes, unless they had a license. Right, without the license. For sure, for sure. Right. So, all that's been locked down, as I understand it, between the 2010 and 2017 agreements put together is APANO and its generic equivalent. That's locked down, right? And you say that is... So, the agreement creates a monopoly in that market because these patents had this license to be on that market without infringing... I don't understand the concern about non-infringing products because all a license gives is... A license, by definition, only makes sense with respect to something that could infringe. If it's not infringing, then you don't need a license anyway because you're not infringing the patent. So, isn't... Whatever was being licensed in 2010 and 2017, aren't we presupposing that the license is coterminous with the scope of the patent? Why are we even talking about non-infringing products? Because they don't need a license. Do you? When we think about the scope of the patent, Your Honor, we think about its exclusionary potential. And once a patentee grants a license to a licensee, it can no longer exclude the licensee. And so, at that point, but it could never exclude the licensee if the licensee weren't infringing anyway. I'm sorry, could you repeat the question? It could have never excluded the licensee if the licensee weren't infringing anyway because that's... You don't even need... Then the license is irrelevant. If I make a product that doesn't infringe a patent, I don't need a license to make the product because I'm not worried about it. Right? And in that situation, Your Honor, if the patentee agreed with the competitor who produces a product that does not infringe, that very much is an antitrust concern and should be subject to rule of reason analysis. And in fact, that's what we have here. Impacts and sales of the generic do not infringe the ENDO patent because of the license. As this court recognized in its decision, when a patentee grants a license, a patentee can no longer exclude the licensee. At that point, the licensee becomes like a competitor in the marketplace. And so, here you have those two competitors coming together, agreeing to share monopoly profits and consumers to pay the price. And we just take the opportunity to show that that agreement violates the antitrust laws, that an agreement like that is not immunized from antitrust scrutiny. Okay. I just want to add to this. This is under 12B6, and we haven't talked about Iqbal and Tuamli. And should this have been analyzed by the district court with respect to the elements of this charmenette from section 22? I didn't hear quite the last aspect of your question. I'm sorry. I mean, we're here under 12B6, and so Iqbal and Tuamli could come into play, but we just haven't spoken about that in terms of whether or not the district court should analyze the allegations with respect to section 1 and 2 of the charmenette. Right, Your Honor. And our argument in our brief is that the district court failed to do that. It failed to credit and accept as true our allegations about the license, about the market. But instead, left ahead and ruled based upon the parties' specifications for why they should be allowed to do this. They put forward that, well, we had this dispute. We should be allowed to do that. Well, the parties in the rule of reason analysis will have the opportunity to forward their justifications as part of the rule of reason analysis, step two of that rule of at the motion-to-dismiss stage to disprove parties' pro-competitive specifications. So just with respect to Iqbal Tuamli, the district court did not assume our alleged facts as true and rule on that basis. Instead, it jumped ahead and ruled based upon, rejected the patent, excuse me, rejected, frankly, the motion to dismiss based upon the parties, basically the parties' justifications for this agreement. And that only happens once we get to page two of the rule of reason analysis. We'd like that opportunity to actually get to that stage as part of the, hopefully, a remand if you agree with us that the district court failed here. In your complaint, are your allegations about what impact got under the 2010 agreement, those allegations of fact or allegations of law? The allegations about what impacts received as part of the 2010 agreement, well, those are allegations of fact. The fact that there is a license, but that's a fact. And... But what that contract gave them? A contract in very uncertain... Another question of law. I'm having trouble sorting it out. Well, so the contract itself, in terms of the provisions itself, it says, we grant you a non-exclusive royalty-free license. That is a fact. Now, if there is a dispute about what that means and you have to construe the contract, well, then we get into some questions of law. Okay. So then your allegations about what they got under the 2017 agreement, what impacts got under the 2017 agreement, those are also... And if there's some confusion about what they were getting, you have to really compare the 2010 and 2017 votes to figure this out. So your argument has been all along and you have to look at what they got in 2010 to figure out what they were getting in 2017. Are those not questions of contract law that the district court does not have to view in the light... Like facts in the light most favorable to the plaintiff? Questions about contract law in terms of, say, the validity or whether or not the 2017 agreement was reached, those... This court does not need to resolve those to rule in our favor regarding what were the rights that impacts enjoyed under his license. It's clear that impacts... I don't like... But if the whole point of the 2017 litigation was by endo to challenge what impacts thought it had under the 2010 agreement. That's why I'm having trouble figuring out how to apply... As Judge Child said, how we apply pleading principles when the whole point of the 2017 litigation was that we disagree about what you got with respect to, I guess, what's been called the future patents in the briefing. We dispute what you got as to the... Under the 2010 agreement. All right. So is that... So they've sent you your complaints as, you know, this is how we interpret that situation. Is that something the district court has to credit to you and assume you're right on, or does the district court have to say that's a legal allegation that I can resolve right now as part of the motion to dismiss? So, you know, the only allegations in our complaint that concern the 2016 agreement are the fact that there was an agreement, but that agreement involved royalties and did not speak to... No, no, no. You have allegations about based on... That's why I said it's a 2010 and 2017... You know, what did you get from 2010 seems to be you put a lot of weight on that because you have said many times in this argument, many times in your brief, they got from 2010 the right to be on the market and stay on the market and nothing in the 2016 litigation was going to change that. But, of course, Endo's complaints in 2016 very much seem to dispute IMPACT's ability to exercise the future patents, what is called the future patents, the patents that Endo held over this product. And so how do we look at those? What is our review for how the district court understood that, you know, that dispute about what IMPACT got in 2010 with respect to the future patents? The dispute about that from the 2016, excuse me, from the 2016 litigation, that dispute and resolving that dispute, including the factual and legal issues in that case, are not appropriate to be considered as part of whether or not our complaint stated a claim. Because? Because of the fact that that is part of the party's justification for why this agreement does not violate antitrust laws and one does not get into the justifications for an agreement until step two of the rule of reason. And our obligation as a plaintiff, under a rule of reason case, under section one, is to allege market power. You don't get to rule of reason until first, but you have to allege up front improper exercise of market power, correct? You have to do that up front in your complaint, to state a claim. If state market power and the fact that the exercise of that market power had antithetical effects. Right. And so if one thought that understanding or resolving this dispute about what they got under the 2010 agreement involved whether or not they had the market power they thought that IMPACT thought it had, then it would go to your statement of a Our claim, again, we just had to state a plausible claim that IMPACT had a right to be in the market. And certainly based upon the license and based upon the fact of what the parties themselves said in two other litigations before federal tribunal. And also you have to include what they said in the 2016 litigation too. You have to look at all three litigations. And there was no determination that that 2016 agreement, 2016 litigation really threatened IMPACT's right to be on the market. We call that, we allege that the parties And the damages would be, I'm sorry, I guess general counsel came to me and said I'm facing trouble, damages under Federal Trade Commission Act or the Sherman Act, however you want to characterize it. Is that serious threat someone should take seriously? I'm going to say yes. In another case perhaps so, but the party's conduct here does not, particularly IMPACT's conduct here, does not suggest a party that was fearing for its ability to be on the market. It's important to note that. So we have to assume, so the allegation is we assume they settled the litigation to create this monopoly and not to eliminate any risk to any litigation risk for IMPACT. That's sort of part of your case. They didn't have any real threat. All they did was use this as an excuse to set up this monopoly. Well, Your Honor, under activists, if they use this agreement and we think they did use this agreement to eliminate the risk, the competition risk facing them and agreed to create a monopoly, share monopoly profits, under activists, that is the relevant anti-competitive harm. So even if you credit their claims now that IMPACT's right to be on the market were in dispute, settling that dispute by agreeing to share monopoly profits, with just one of them remaining on the market, that is a relevant anti-class harm under activists and we'd like to go make that case on remand. Let me make sure my colleagues don't have additional questions at this point. We'll give you a little time for rebuttal. Thank you very much, Your Honors. Mr. Gordon. Thank you, Your Honor. May it please the Court, George Gordon for the affilies Endo Pharmaceuticals, Inc. and Endo International. The problem with the FDC's position in this case is that it has no real limiting principles. What we just heard from counsel is that all they have to plead is market power and conduct that creates a risk of an anti-competitive. And here what they've pledged is that Endo and IMPACT's entered into agreement with a patent holder, Endo, chose to allow IMPACT's to be the only one practicing the patent to the exclusion of both itself as the patent owner and others, other potential licensees. That describes literally every exclusive license. And the patent act is... Well, it doesn't describe exclusive licenses, which they say at least the majority are vertical as opposed to horizontal competitors or other, involve other types of agreements that are between two head-to-head direct competitor horizontal competitors. There are certainly vertical agreements. I'm not in a position to say and don't believe, as a matter of fact, but I don't think it's relevant to the Court's decision, that those are the majority. There are plenty of examples... So you just said every exclusive license. I was just trying to clarify that. Yes. I appreciate their position. They're only talking about exclusive licenses between two head-to-head horizontal... No, because I'm also talking about the kind of exclusive license that was issued in a Studey and Goodkellenschaft case from this circuit, where the Court recognized that even though it was a vertical license as with respect to the licensor and the exclusive licensee, it did actually have very clear horizontal competitive effects because it also excluded other horizontal competitors from the relevant market. Having the effect, just as the FTC alleges here, of raising prices and allowing the patent holder and the exclusive licensee to share monopoly profits, which again... So really what the FTC's position would require in order to escape scrutiny under the HHS laws is the exclusive license would have to be for a patent that neither the patent holder can actually or potentially practice or any other exclusive licensee can actually or potentially practice. That is a very rare thing if it exists at all, Your Honor. So I think that the difference between vertical and horizontal is more than a bit illusory in this case and frankly in any case because exclusive licenses, even when the patent holder isn't or has chosen not to practice the patent, still have a horizontal effect with respect to other licensees. And the patent holder itself, if the patent holder could choose to practice the patent, but decides not. I just want to ask you about the theory of the 2016 complaint. Was it ENDO's position in that complaint, in that litigation, that the alleged breach of the 2010 licensing agreement invalidated the license? It was ENDO's position. It had sent a notice of termination, but the license had not terminated. It was ENDO's position that the royalty negotiation, the royalty payment, was a condition of practicing the license so that if that condition was not satisfied, there would not be, there would no longer be a license that INPAX is practicing under, which is why in the cases of the breach of contract claims, ENDO did bring patent infringement claims as well. All right. So just to answer just more directly for my purposes, ENDO's position was that the alleged breach and the failure to negotiate of the royalties for the future patents, I think that's what you all call them, was a breach or if they didn't start negotiating right away, would be a breach and they would lose their license? The license would no longer be effective. That's correct. Okay. And the argument was that they had already breached it by not negotiating or was the point of the litigation to prompt them to negotiate? It's just I'm not understanding the issue. It was already breached. It was already breached. In ENDO's view, at the time of that litigation, they had lost the license. They had lost the right to practice the patent. That's correct, Your Honor. They had lost the license? They had lost the license, yes. Okay. Thank you. So as you just mentioned, another aspect of the 2016 complaint by ENDO was an allegation of patent infringement? Yes. So with respect to that, I don't think this is the FTC's theory, but because ENDO had alleged patent infringement, then does that bring into play activists' concern that sometimes you could have parties enter into a settlement where the validity of the patent is an issue? No, because the validity of the patent had already been tested and the patent had survived. But you alleged patent infringement, and so it was definitely an issue in that case. Well, ENDO's position of the validity wasn't actually an issue because it had already been tested and survived the validity challenge, including validity challenges by IMPACT as well. IMPACT was not in the litigation that we call in our paper the Southern District of New York litigation with respect to its original formulation of oxymorphone ER. It was in that case with respect to its crush-resistant ENDO of oxymorphone ER. But more importantly, Your Honor... Is IMPACT also marketing the crush-resistant? No, it did not launch the crush-resistant. Only the original version. More importantly, Your Honor, is there was no payment. The concern in activists was that there was basically a payoff, right? By the patent holder to stop a pressure-testing challenge for the patent, to protect a weak patent, I think is the majority called it. There's no payoff here from ENDO, the patent holder, to IMPACT, the alleged infringer. But the royalty went the other way. What happened here is there was a dispute over whether or not IMPACT could practice the patents without paying a royalty. The parties had that dispute. The court recognized that ENDO's position survived a motion to dismiss, and the parties settled that dispute with IMPACT's agreement to pay a royalty. No, but there was a payoff in the grant of the license. Well, it received in return for that what ENDO had the right to give, which was an exclusive license. Right. Right. So there's nothing... I think it was Judge Miller who used the term, is there anything kind of suspicious about the 2017 agreement? The way the majority of activists, anyway, seemed to think that the reverse payment was suspicious. And the answer is no. IMPACT's got a resolution of its right to practice under the patent, and it got what ENDO had the rights under the patent. I think it would have been a different theory. I guess my question is, if the FTC brings a complaint that alleges that there's something suspicious because the patent was an issue in 2016 per your own allegations, and I take it IMPACT didn't agree that they had infringed the patent. You can ask them, but... That's correct. I assume that that's... So the patent that was alleged to have been infringed in 2016 was an issue. And if somebody filed a complaint that said that's an uncertain patent, all that the way this resolved is suspicious in the same way that the activist majority was concerned about, then is that a... Why isn't that just at least a viable theory? I'm not saying that's a theory of this case. I'd say two things. If the FTC thought that was a viable theory, then the FTC knows well how to plead a reverse payment case. It's pled many, including FTC, the activist. It would have pled a reverse payment case here. Right. I'm granting you that that wasn't pled here. I guess I'm wondering, though, why conceptually that's not possible? Because there's no reverse payment. In FTC, the activist, you had both basically in the form of both cash and side deals, consideration going from the patent holder, who's trying to protect this patent, to the infringer. And the only thing coming back from the alleged infringer was we're going to drop our challenge, right? And so we're not going to pressure test that patent. This 2017 settlement is very different. It's very much like, as Judge Lamberth recognized, the kind of commonplace settlement that the majority described in activist, where ENDO believed and stated a claim that IMPATS owed it royalties to practice under the patents. IMPATS settled that case by agreeing to pay royalties to practice under the patent. That's not a reverse payment. It's not a payment to protect the waived patent. And there's no reason to believe ENDO wanted to protect that patent. It tested those patents at trial, and it tested those patents all the way up to actually multiple trials, Your Honor, and it won all of them that went to trial. And it tested those patents all the way up to the Federal Circuit, and they were found to be valid. I'm sure my colleagues don't have questions, additional questions for you. Thank you, Mr. Lefkowitz now. May I please support Jay Lefkowitz on behalf of IMPATS? And I think I can be quite brief this morning because I think we've covered a lot of the ground. I'd like to just make a few observations in response to some of the questions that were raised by the panel. On your point, Judge, you asked about, well, if there was an alleged claim of infringement, doesn't this bring us into activists? And what activists are concerned about, first and foremost, the court said, it says we're not addressing the typical case where the patentee brings an infringement claim. They use the example for $100 and there's $40 paid. That's not an issue. We're concerned where the payment goes in the other direction. Here, of course, in paragraph 98 of the FTC's complaint, they allege that the net present value of the payments in this case, payments from IMPATS to ENDO were over $250 million. That, of course, is the best evidence this is the typical exclusive license. And Judge motioned to dismiss rule. And of course, as you pointed out, they were scared. They had a suspended license. The court had said this claim can proceed. They were facing, in the complaint, enhanced damages. This is at 25 of the complaint. Further equitable relief, also at 25. And of course, it has provided a motion to dismiss. So they settled. This is the complaint you're talking about, ENDO's complaint. ENDO's complaint back in 2016. That's what was at issue. So to say that they had a risk-free license and to say this court or Judge Lambert had to accept that as true, that just makes no sense. He was entitled, clearly, leaving aside whether it's a legal inclusion or not, and I think that's a fair question. He was entitled to look at the public record that the allegation that ENDO made survived the motion to dismiss. So we're in a situation where essentially we have, as you pointed out, Your Honor, right at the beginning, a garden variety exclusive license. Now, Your Honor, just to let you ask at the beginning to the SEC, well, was it improper to settle? They said no, it wasn't. But their concern is we either, and we've heard two things, both today and in the brief. On the one hand, we've heard today it was improper to enter into that license in 2010. In their briefing, they seem to be suggesting that having given a non-exclusive license, they now couldn't change it to a more exclusive license. And I would simply point out, even in their complaint, they don't actually suggest that this is a true exclusive license. They recognize, I think it's paragraphs 94 and 105, that it wasn't a true exclusive license. If ENDO impacted, stopped selling, if they couldn't get access to enough material, ENDO could have come into the market on its own or licensed this to someone else. And as the D.C. Circuit said in the City and Shacelle case, one of the things we look at is whether a license is less than exclusive, that even makes it more competitive. But even if it's an absolute exclusive license, which this court in the 1981 case said was totally fine, the only question is, does something happen in activist that changes that analysis? Activists was concerned, as I said, principally with the unusual situation, as the court pointed out in activist, where a party with no claim for damages walks away with money simply so it will stay away from the patentee's market. We clearly didn't have that here. But there was another issue in activist that we don't have here, which is the concern that the patentee is not only paying money to the generic to stay out, but because of the six-month exclusivity issue, they're essentially icing out all of the other generics because having made a deal with the first filer, none of the other generics have the same incentive to even come and challenge the patent because they're going to be backed up behind this six-month exclusivity. We had no such issues here. There was no exclusivity. Impact has been selling this product for many, many years already. So I would say, and finally, on this question of 12C6, well, the judge took a very careful look at the allegations in the complaint, and he went beyond what I think he even necessarily had to do, which was simply look and see that this is nothing more than an allegation of an exclusive license. He actually tested it as best as he could against the activist factors, recognizing that without the 30-month, the six-month exclusivity, you didn't have all the factors lined up. And he said, and this is all at pages 211 to 217 in the joint appendix. He looked at it and he said, there's no question here of patent price-fixing or cross-licensing. Those were the concerns that activist addressed in terms of line material and chamber and new label. None of those concerns, as Your Honor pointed out, Judge Millett, were not going beyond the patent at all. He also said, this is a traditional settlement, which the Supreme Court made clear, and so an activist, insofar as the dissent urges that settlements taking these commonplace forms have not been thought for that reason alone to be subject to any trusted liability, we agree and do not intend to alter that understanding. Activists would focus on something unique. And then the court recognized that Section 361 of the Patent Act and precedent allows exclusive licensing. So, Your Honor... But, Judge Millett, under the 2017 agreement, what right under the patent did impacts acquire that it didn't previously have? Well, because as the judge found, when ENDO brought that lawsuit, they said, your right to practice this patent continually with respect to the future patent is subject to the negotiation in good faith for new terms or royalties. And the fact that you have refused to do that when we made this offer of 85 percent, and you refused and you kept selling meant that you were in breach of the contract, the 2008 contract, and therefore you are infringing our patent. So, what right under the patent did you acquire under the... that you didn't previously have, did you acquire under the... We acquired a new license, a license that had been suspended, and it was a license to practice... Do you agree that the license was suspended during the litigation? That was the theory of their... I know, but I'm saying it was impacts. I guess that was their theory. Well... I assume you kept selling through the litigation. We did, but we kept selling... So, you didn't think the license was suspended. Well, Your Honor, we... I think what happened actually was we did keep selling, they saw enhanced damages because of that, and they saw equitable release. Parties are not obviously required to seek like a TRO to take you off the market. Sometimes patentees say, look, you're my guest, you can... But I could phrase the question the way I did. I think you described how ENDO would look at the agreement, that now, okay, they lost that agreement, but now we're giving you a new one. Does EMPATS agree that it got a license it didn't have before under the patent? I think EMPATS' litigating position was, look, we're entitled to this, and we don't have to negotiate a new license. But once the trial judge said, you know what, that's in question, their complaint stands, it survives the motion to dismiss, there was an enormous amount of threat. Right, so you've got a certain responsibility. And I think we got... That's not a right under the patent act. I think we got a license. In fact, I don't think there's any way to look at the 2017 agreement and not say it is in fact a patent license. And it's a somewhat different patent license than the one that we believe we got in 2010. A new patent. Even if you're replacing patent license, even if you thought the other one continued until that. Correct. And the court, and just to make this last point, parties, even parties that compete with each other, that have complete freedom to operate with joint patentees, can license to each other. And in the Sixer, the Miller form case, they cleared that a patentee can actually take away a license that is granted if it wants to simply compete more rigorously with a former licensee. And while in that case, the court acknowledged it might have been a contract violation, the parties might've been breaching contracts, it raised no antitrust concerns. And the reason you call it a new license, there was obviously an agreement on the royalty rate in the 2017 agreement. And is it your conceptual sense that whenever there's an agreement on a royalty rate going forward, that necessarily means it's a new license? You could also consider it just to be a fixing of a royalty rate for a license that already existed. You can certainly amend the license. Parties could have a license and then they could amend it based on future facts and circumstances. And frankly, that I think initially what ENDO sought to do, they said, look, you have a license and we want a new royalty, but they also said, you have an obligation to do that. And if you don't agree, then we're going to treat this as infringing our patent because we're going to say you breached. And while we strenuously objected, once the federal judge issued his ruling and said, that's the viable claim to proceed and we're facing trouble damages, then we have to essentially negotiate a new license. Is it unusual that ENDO's complaint didn't seek an injunction, even at least a permanent, maybe not a preliminary one, but its ultimate relief, a permanent injunction? Well, it did seek paragraph 25 of the complaint, not only enhanced damages, but further equitable relief. And I understood that further equitable relief could mean to take us off the market. Was it unusual for them not to have spelled out in their complaint for relief in a context like this, an infringement case, a request for a permanent injunction? I've seen cases where patentees try to take the competitor off the market immediately. I'm not talking about a preliminary injunction. I'm talking about a complaint, relief at the end of the case. I think they're framing... No, I don't read anything into that. I think they raised... You've seen other complaints that involve infringement where the holder of the patent has not included a request for... At the end of the case, people may not want to fight about preliminary injunctions. That's always hard. At least at the end of the case. If I win my case, I want you to enjoin them from marketing. Well, I think the further equitable relief speaks to that. And I understand that you're reading further equitable relief. I'm asking you is that I don't do patents. There's no doubt that you do more because you've done one. So is that commonly how this is in complaints? Or is it much more common for them to have that line in there? I'm sure if I were the lawyer drafting that, I'd be very... I can't speak... Nervous. My friends would be very mad at the end of the day if this court goes, you didn't ask for it, so you're not getting it. I think... I can't speak to why ENDO said we want further equitable relief and didn't specifically say at that time. They would have been entitled in the course of the case to specifically define the equitable relief they wanted. But also, they were confident. They had just prevailed. The patents had succeeded and been affirmed by the Federal Circuit. They might have felt, look, we're racking up treble damages on every dollar they sell. Let's let them stay out there for a while and we'll take them to the cleaners. Okay. Thank you, counsel. Very much, John. Mr. Haggis will give you three minutes for rebuttal. Thank you, Your Honor. I'd like to start with that very last point about ENDO just leaving IMPACTS on the market to... While ENDO... ENDO's IMPACTS accumulates all this damages liability. ENDO approached IMPACTS to settle this case. IMPACTS approached ENDO to settle the case. That definitely suggests that IMPACTS had confidence in this position despite having lost on its motion to dismiss. Would your case be any different if ENDO had been the other way around? Would your case be... Is that at all material to whether you stated the claim of any trust violation here or Sherman Act or Federal Trade Commission Act? It goes to this question of whether or not our allegation regarding IMPACTS' right to be on the market is plausible. And so the conduct of the parties suggested that IMPACTS really much believed it had that right. In addition, I'd like to point out... Does it affect your legal position whatsoever, your legal theory at all? It doesn't affect the legal theory at all. It goes to whether or not our complaint is plausibly alleged that IMPACTS had a right to be on the market. I would like to address, though, this question of the unusual nature of the agreement in ACTIVIS versus this one. One of the keys in ACTIVIS was the fact that the generic received a payment from the and that was deemed to be unusual. There's some very unusual aspects to this agreement as well. To begin with, this was a dispute about royalties. And out of that dispute, in settlement of that dispute, IMPACTS received monopoly. If IMPACTS had prevailed in the litigation over the royalty rates, IMPACTS would not have obtained a monopoly. So that's highly unusual. And so to say that this is... If they had prevailed, ENDO couldn't have gotten a royalty either, right? Oh, that is correct, Yonah. And it would have been a continuation of the status quo where IMPACTS had a right to be on the market. But IMPACTS coming out of the settlement was royalty was highly unusual. And so it makes it comparable to what happened in the ACTIVIS case. Another thing I'd like to point out with respect to ACTIVIS is the fact that the uncertainty is not just about patent validity. It's also about infringement. And here we have uncertainty about the respective competitive rights of these two parties. And they settled that uncertainty by agreeing to monopoly and sharing monopoly profits. And that is the relevant anti-competitive harm under ACTIVIS. Can you tell me, how would you deal, if you're right in the opinion in your favor, with Supreme Court's decision in Westinghouse, which ACTIVIS reaffirmed? And that was an agreement not to compete between two direct competitors, a patent holder and a direct competitor. In that situation, GE licensed Westinghouse to be a producer for it. A direct horizontal competitor. No, there's actually disagreements about what was going on in that case. Many people view that as having been a full agreement. What did the Supreme Court say to this? The Supreme Court allowed it. It was a horizontal agreement between two direct competitors. The Supreme Court has not clarified that. They kind of say, okay, well, we know there's this GE case out here. But in these other cases, the GE case has come under a great deal of scrutiny, both by courts as well as by commentators. The Supreme Court has never overruled it. We're bound by it. And they cited to it again in ACTIVIS. So we have to read ACTIVIS with Westinghouse, taking Westinghouse at its word every word. That's what I'm asking you to reconcile. Right, right. But this is not the GE-Westinghouse situation. Because of the competitive relationships that you have between ENDO and IMPACT, my understanding is that Westinghouse didn't have a competitive relationship. Westinghouse needed to be licensed in order to exercise that patent, in order to get those light bulbs. Here, we have a situation where ENDO, excuse me, IMPACT is already on the market via the 2010 license. And thus, they have this horizontal, fiercely competitive relationship that did not exist in the GE-Westinghouse situation. But fundamentally, and here, the court's decision, including Michelle's talk, COLA supports us, is that we're asking that this agreement be subject to antitrust scrutiny. This court subjected the vertical agreement in the FK case to antitrust scrutiny, to rule of reason analysis. And all we're asking for here is the opportunity to present our case under the rule of reason. And we would ask you to please remand the case, reverse remand, and allow us that opportunity to make our case. Thank you, counsel. Thank you to all counsel. We'll take this case under submission.
judges: Srinivasan, Millett, Childs